COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Annunziata and Overton
Argued at Richmond, Virginia


NAN S. VICK

                                        MEMORANDUM OPINION[*] BY
v.          Record No. 0722-96-2        JUDGE ROSEMARIE ANNUNZIATA
                                              MARCH 18, 1997
VIRGINIA EMPLOYMENT COMMISSION, ET AL.


                FROM THE CIRCUIT COURT OF NOTTOWAY COUNTY
                  J. Warren Stephens, Judge Designate

            Nan S. Vick, pro se.

            Lisa J. Rowley, Assistant Attorney General
            (James S. Gilmore, III, Attorney General, on
            brief), for appellees.



        Nan S. Vick (appellant) appeals a final order of the Circuit

Court of Nottoway County affirming the decision of the Virginia

Employment Commission (VEC) to disqualify her from receiving

unemployment benefits for having voluntarily left work with

Foote, Inc. (employer), without good cause. See Code

§ 60.2-618(1).[1]  This finding was initially rendered by a VEC

---

        [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

        [1]Code § 60.2-618 provides, in part:

            An individual shall be disqualified for
        benefits upon separation from the last
        employing unit for whom he has worked thirty
        days or from any subsequent employing unit:

            1. For any week benefits are claimed
        until he has performed services for an
        employer during thirty days, whether or not
        such days are consecutive, and subsequently
        becomes totally or partially separated from
        such employment, if the Commission finds such
        individual is unemployed because he left work

claims deputy. On appeal, evidence was taken before a VEC appeals examiner who affirmed the claims deputy. On further appeal, a VEC special examiner heard oral argument but took no further evidence; the special examiner affirmed the appeals examiner. The matter was then appealed to the circuit court. On appeal to this Court, appellant contends that (1) contrary to the ruling of the circuit court, the record does not support the VEC's findings of fact; (2) the VEC's findings were procured by fraud on the part of employer; (3) contrary to the ruling of the circuit court, the VEC erred as a matter of law in concluding appellant left work without good cause; and (4) the VEC special examiner erred in denying appellant's request to present additional evidence. We disagree and affirm.

"An individual shall be disqualified for [unemployment] benefits . . . if the commission finds such individual is unemployed because [she] left work voluntarily without good cause . . . ." Code § 60.2-618(1).

> "[G]ood cause" . . . "has not been specifically defined by the legislature or the Supreme Court." However, the consistent view of the [VEC], "acquiesced in by the General Assembly," has required an employee

(..continued)

> voluntarily without good cause. As used in this chapter "good cause" shall not include (i) voluntarily leaving work with an employer to become self-employed, or (ii) voluntarily leaving work with an employer to accompany or to join his or her spouse in a new locality. An individual shall not be deemed to have voluntarily left work solely because the separation was in accordance with a seniority-based policy.

to "take those steps that could be reasonably expected of a person desirous of retaining his [or her] employment before hazarding the risks of unemployment."

Virginia Employment Comm'n v. Fitzgerald, 19 Va. App. 491, 493, 452 S.E.2d 692, 693 (1995) (citations omitted).[2] Determination of "good cause" involves a two-part analysis. The VEC and reviewing courts must apply an objective standard, first to the reasonableness of the employment dispute and then to the reasonableness of the employee's efforts to resolve that dispute before leaving. Umbarger v. Virginia Employment Comm'n, 12 Va. App. 431, 435, 404 S.E.2d 380, 383 (1990). An employee may not rely upon his or her own "unreasonable and purely subjective perception" to justify voluntary unemployment. Id.

The issue whether an employee voluntarily quit without good cause involves a mixed question of law and fact reviewable on appeal. Fitzgerald, 19 Va. App. at 493, 452 S.E.2d at 693. However, this Court must give deference to the VEC's findings of fact underlying its decision. Indeed,

[o]n review, [we] must consider the evidence in the light most favorable to the finding by the [VEC]. Code § 60.2-625 sets forth the standard of "judicial review" for appeals from the decisions of the VEC. "[I]n such cases . . . the [VEC's] findings of fact, if supported by evidence and in the absence of fraud, are conclusive." The VEC's findings

[2]In construing the meaning of the phrase "good cause," the VEC has limited it to those factors or circumstances which are so substantial, compelling and necessitous as would leave the claimant no other reasonable alternative to quitting. Phillips v. Dan River Mills, Inc., Commission Decision 2002-C (June 15, 1955).

> of fact need only be "supported by evidence"
> for them to be binding on appeal, unless we
> conclude that no evidence supports the
> findings or that they were obtained by fraud.

Bell Atlantic v. Matthews, 16 Va. App. 741, 745, 433 S.E.2d 30,
32 (1993) (citations omitted).

## I.   VEC'S FACTUAL FINDINGS

We find evidence in the record to support the VEC's factual
findings.

Appellant worked as a bookkeeper and secretary for employer,
a retailer and wholesaler of tires and automotive services, from
February 1991 until May 25, 1994.  William C. Foote, general
manager and part owner of employer, was appellant's supervisor.
William F. Foote, the father of William C., was the residual
owner but was disabled from working.  David Williams was
employer's service manager; he was not one of appellant's
supervisors.

William C. and Williams testified that, during her tenure,
appellant developed a poor attitude toward her coworkers and
customers and was unable to get along with any of her coworkers.
 In particular, Williams and appellant could not get along.
Appellant attributed the conflict to Williams' sexual harassment
of her.  Williams, however, denied that he had sexually harassed
appellant in any way.  On cross-examination by appellant's
counsel, Williams denied specific allegations of sexual
harassment, including his exposing himself to appellant and his
directing lewd comments at appellant or stating them in her

presence.  William C. testified that the alleged incident of Williams exposing himself did not occur.  Although William C. was aware of the conflict between appellant and Williams, he testified that he was unaware that it had anything to do with sexual harassment.  He stated that appellant never complained of sexual harassment.

Employer had no written policy for resolving disputes among coworkers.  William F. attempted to resolve the conflict between appellant and her coworkers.  William C. admitted that he had directed Williams and appellant to work out their problems themselves.  Appellant quit her job at least three times during the year prior to May 25, 1994 because of personality conflicts with other employees.  Each time, she sought to be reinstated and employer allowed her to return.

Appellant quit because of the events of May 25, 1994.  On that day, appellant took responsibility for a mistake Williams made and was then admonished by William C. for the manner in which she handled it.  The unfairness of such treatment in appellant's eyes was compounded by the fact that she had undertaken Williams' work, an individual with whom she was in continual conflict.  Although appellant's aggravation tempered and she continued to work, it was reignited when William C. referred to her as "Queenie" in front of a customer.  At that point, appellant told William C. that she quit.

Appellant testified that William C. had called her "Queenie"

numerous times and that she had repeatedly asked that the verbal abuse stop. William C. denied both allegations. Appellant testified that she probably would have quit notwithstanding being yelled at and called "Queenie" by William C. She testified that it was unreasonable for employer to assume she would perform Williams' work duties, when she considered Williams to be sexually harassing her. She admitted, however, that she had previously completed similar tasks. After she quit, appellant again sought to be reinstated. This time, however, employer refused to rehire her.

## II.  FINDINGS PROCURED BY FRAUD

Appellant contends that even if the record supports the VEC's findings, those findings are not conclusive because they were procured by fraud. The record shows that the issue of fraud was not raised in the circuit court. Appellant made no reference to fraud in her petition for judicial review, and the circuit court specifically found that "fraud has not been alleged." Accordingly, appellant's contention on appeal is procedurally barred. Rule 5A:18.

## III.  "GOOD CAUSE"

We agree with the trial court that the VEC properly applied the law to its findings of fact. While the events of May 25 may have been a "reasonable employment dispute," the record shows that appellant took no measure, reasonable or otherwise, to resolve that dispute before leaving employment. Cf. Umbarger, 12

- 6 -

Va. App. at 437, 404 S.E.2d at 384.

Moreover, although appellant contends that the events of May 25 were merely the end of a continuing pattern of sexual harassment, the record supports the VEC's finding that this was not the case. Most importantly, Williams denied any act of sexual harassment in general and specifically denied each of the acts appellant's counsel alleged. As trier of fact, the appeals examiner was entitled to credit Williams' testimony. Moreover, although William C. was aware of the conflict between appellant and Williams and did little if anything to resolve it, he was unaware that the conflict involved sexual harassment. While an ongoing pattern of sexual harassment would, we believe, clearly amount to a "reasonable employment dispute," the record here belies such a scenario. Rather, the record supports the finding that the only ongoing pattern of conflict was a personality dispute between Williams and appellant. We find that a personality dispute among coworkers, without more, is not a "reasonable employment dispute" amounting to "good cause" to quit voluntarily within the meaning of Code § 60.2-618(1).[3]

## IV. SUPPLEMENTAL EVIDENCE

Finally, appellant contends the special examiner erred in failing to allow her to supplement the record taken before the

_____

[3]The dissent's characterization of the "evidence proved" is an eloquent recitation of appellant's testimony. That testimony, however, was mostly contradicted. Well established principles of appellate review bind us to the VEC's determination that the events appellant described did not, in fact, transpire.

appeals examiner with additional evidence. However, appellant failed to raise this contention before the circuit court. Accordingly, her appellate argument is procedurally barred. Rule 5A:18. Moreover, based on appellant's representations the special examiner determined that each piece of additional evidence appellant sought to present could have been presented at the hearing before the appeals examiner through the exercise of due diligence.

For the foregoing reasons, the decision of the commission is affirmed.

<u>Affirmed.</u>

Benton, J., dissenting.

The evidence proved that Nan S. Vick was the only female employee at a business that sells, retail and wholesale, tires and automotive services. She was a full-time bookkeeper and secretary. The general manager testified that her job performance was good.

Over a period of years, Vick experienced difficulties with other employees of the business. Vick attributed many of those difficulties to instances of sexual harassment. The evidence proved that when Vick complained to the general manager of problems with employees, he informed Vick and the employees about whom she complained that they would have to resolve those disputes among themselves. At the evidentiary hearing the general manager testified that Vick's problems with the employees were "personality conflicts." Although he was unable to recall the nature of those disputes, he testified that she had made no complaints of sexual harassment.

Although the general manager denied that Vick was sexually harassed, the evidence proved facts to the contrary. The evidence proved that Vick quit her employment on four previous occasions because of incidents that she believed to be intolerable harassment. The evidence also proved that the business re-employed Vick on each of those occasions. Although the evidence does not contain specific details of each of the incidents that gave rise to her quitting, the evidence does

- 9 -

establish that on one occasion Vick quit because of lewd remarks and harassment from an employee.  The evidence further proved that the general manager rehired her and required the other employee to apologize to Vick for lewd comments that the employee made to Vick.

The evidence also established that Vick quit her employment on another occasion because of offensive comments and conduct by the service manager.  Vick was rehired on that occasion.

The evidence also proved that a calendar of offensive photographs of women was hanging in a work area under the control of the service manager.  The calendar was only removed after a female customer of the business complained.

In addition, Vick complained to the general manager that the service manager exposed his buttocks to her in her office.  The general manager, who was in the vicinity when that incident occurred, testified that the service manager was a large man and that his shirt became untucked when he bent over to pick up an item.  The service manager testified that when he went into the office to retrieve an item, his shirt became untucked and his "butt was showing."  Vick complained when the incident occurred. However, the service manager told her that if she had not looked she would not have seen it.  The general manager deemed this matter to be a "personality dispute."  Vick filed a criminal complaint charging that the service manager indecently exposed himself.

These events add to the context of Vick's decision to quit her employment on May 25 when the general manager, Vick's immediate supervisor and an owner of the business, referred to her as "Queenie" in the presence of a customer. The evidence is undisputed that the service manager had failed to prepare an invoice on that day that Vick needed to complete other documents. Without those documents the customer would be unable to obtain his vehicle. When the customer arrived, the service manager was away from the business. Because Vick did not have the necessary paperwork from the service manager, she went to the general manager to obtain prices to prepare the invoice. At the evidentiary hearing, the general manager agreed that the problem that Vick was encountering with the customer in her office occurred because of the service manager's lack of attention.

When Vick obtained the information and returned, the customer expressed dissatisfaction with the quality of the work and began to complain. Vick again sought the general manager. The testimony is disputed about the discourse that occurred between Vick and the general manager. The general manager testified that Vick inappropriately interfered while he was talking to customers. Vick testified that she politely sought to inform the general manager of her need to have his attention to resolve the ongoing problem with an irate customer.

The general manager testified that when he entered Vick's office he admonished Vick for the way she had approached him

while he was talking to a customer.  Vick testified that the general manager yelled at her and addressed her derogatorily as "Queenie" in the presence of customers.  Vick became upset and later that day quit her employment.

Vick testified that the general manager had called her "Queenie" on other occasions and she had asked that he not verbally abuse her.  The general manager testified that he had never before used that term in addressing Vick and that Vick had never complained about his use of that term in the past.  He further testified regarding the term as follows:

> I don't distinctly remember calling her Queenie that day.  [B]ut . . . it's possible.  It's not a term, it's a term that I, that's used in my family as, a jokingly term, not a term that's meant to hurt or anything like that. . . . [I]f it did in fact hurt her I apologize for it.

The commission in its findings of fact stated as follows:

> On the claimant's last day of work, May 25, 1994, the employer was shorthanded and the claimant had to deal with customers.  At least one customer was upset with the work performed and the claimant attempted to bring this to the attention of the [general manager].  At the same time, the claimant was required to prepare invoices for work performed.  This is normally handled by the service manager.  However, the service manager was not at work at this time.  During the course of this situation, the [general manager] referred to the claimant as "Queenie" in front of a customer.  The [general manager] had referred to the claimant in this way on a few occasions in the past.  The claimant had never complained to the employer concerning this term.
>
> On the claimant's last day, she was advised that she had to finish some work before she

could go on vacation.  She was upset with this situation and was also upset because she felt she was being forced to do the work of another employee during his absence.

In the past year, the claimant and the [service manager] were having difficulties getting along.  The [general manager] advised the claimant and the other employee that they would have to work out these difficulties on their own.

In the past several months, the claimant had quit on at least three occasions.  After each of these separations, the claimant went back to work for the employer.

The determination of what constitutes "good cause" is a mixed question of law and fact reviewable by this Court on appeal.  See Johnson v. Virginia Employment Comm'n, 8 Va. App. 441, 447, 382 S.E.2d 476, 478 (1989).  "Factors that . . . are peculiar to the employee and her situation are factors which are appropriately considered as to whether good cause existed."

Johnson, 8 Va. App. at 451, 382 S.E.2d at 481.

The purpose of the [Unemployment Compensation] Act is to "provide temporary financial assistance to [workers] who [become] unemployed without fault on their part.  The statute as a whole . . . should be so interpreted as to effectuate that remedial purpose implicit in its enactment."

Israel v. Virginia Employment Comm'n, 7 Va. App. 169, 172, 372 S.E.2d 207, 209 (1988).  On this evidence, I would hold that the evidence does not support the commission's conclusion that Vick "left work voluntarily without good cause."  Code § 60.2-618(1).

The record supports Vick's reasonable belief that she was being harassed and that her employer was unresponsive to her

complaints.  Indeed, when the other owner of the business was asked what the procedure for resolving the conflicts was, he stated, "Very rarely did I get into that.  That was handled primarily by [the general manager] . . . I asked [the service manager] to bear with the situation.  I asked [Vick] several times to lighten up . . . try smiling."  In addition, when the service manager was asked why the conflicts remained unsolved, he testified that "Mrs. Vick would constantly just come up with something else, a trifling event that she would blow out of proportion."  The record graphically demonstrates that Vick was consistently harassed by employees and, when she complained, was told to work out those problems without any intervention by the general manager.  She was subject to lewd and offensive remarks by employees and gained no relief from the general manager.  Only after she quit her job did the general manager take action.  When she was rehired, the offending employee was required to apologize.  Even when the service manager exposed his "butt" to her, and she reported the matter to the general manager who was present, no action was taken.  Despite the service manager's retort, the general manager took no action and did not recognize these to be instances of harassment.

Thus, the evidence proved that Vick did not have "the benefit of an established, designated procedure for addressing employee grievances."  Umbarger v. Virginia Employment Comm'n, 12 Va. App. 431, 437, 404 S.E.2d 380, 384 (1991).  When Vick

- 14 -

complained in the past the general manager instructed her to resolve the problem without his intervention.  Quitting was the only recourse through which she was able to obtain relief.

Furthermore, the general manager acknowledged that he was familiar with the term "Queenie" and used it in a joking manner in his personal life.  Moreover, the commission found as a fact that the general manager referred to Vick in that manner on May 25 in the presence of a customer.  It was an offensive remark, made in a circumstance to cause humiliation and embarrassment to Vick.  The record proves that she had no recourse for correcting the conduct.  The majority states that "[w]hile the events of May 25 may have been a 'reasonable employment dispute,' the record shows that [Vick] took no measure, reasonable or otherwise, to resolve that dispute before leaving employment."  Given the employer's past refusals to intervene and the fact that, this time, her dispute was with her direct supervisor, I would hold that Vick reasonably concluded that no avenues were available to her to utilize in resolving this dispute.

For these reasons, I would hold that Vick's leaving was for good cause and that she is not therefore barred from receiving unemployment benefits.